IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs May 19, 2020

**STATE OF TENNESSEE v. RANDALL KENNETH REED**

**Appeal from the Criminal Court for Hamilton County**
**No. 281407   Thomas C. Greenholtz, Judge**

_____

**No. E2019-00771-CCA-R3-CD**

_____

This appeal arises from the second jury trial of the Defendant-Appellant, Randall Kenneth Reed, for which he was convicted of first degree premeditated murder, first degree felony murder, aggravated robbery, and theft of property, and received an effective sentence of life imprisonment. See Tenn. Code Ann. §§ 39-13-202(a)(1), (a)(2), 39-13-402, 39-14-103. In this appeal, Reed argues: (1) the trial court erred in denying his right to self-representation; (2) the trial court erred in denying his motion to suppress, which it construed as a motion for reconsideration; (3) the evidence is insufficient to establish his identity as the perpetrator of the offenses; (4) the guilty pleas he made in front of the jury should have been assessed and a new jury empaneled to ensure that he had a fair and unbiased trial; and (5) the trial court erred in admitting life and death photographs of the victim at trial. After carefully reviewing the record and the applicable law, we remand the case for entry of corrected judgment forms in Counts 1 and 2 as specified in this opinion. In all other respects, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3, Appeal as of Right; Judgments of the Criminal Court Affirmed**
**and Remanded for Entry of Corrected Judgments**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and J. ROSS DYER, JJ., joined.

Robert DeBusk, Chattanooga, Tennessee, for the Defendant-Appellant, Randall Kenneth Reed.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Neal Pinkston, District Attorney General; and Andrew Coyle and Jason Demastus, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

The offenses in this case occurred on June 15, 2011. In September 2011, a Hamilton County grand jury indicted Reed for one count of first degree premeditated murder, one count of first degree felony murder, one count of especially aggravated robbery, and one count of theft of property.

At his first trial, Reed was convicted as charged. Reed appealed, and this court reversed his convictions and remanded the case for a new trial based on the admission of evidence at trial regarding Reed's refusal to take a polygraph examination and potential suspect Milo Geiger's request to take a polygraph examination. See State v. Randall Kenneth Reed, E2015-01638-CCA-R3-CD, 2017 WL 1959497, at *8 (Tenn. Crim. App. May 11, 2017).

The proof at trial established that on June 15, 2011, Jane Stokes, the seventy-one-year-old victim, failed to come to work. James Hutcherson, the victim's employer, believed the victim's absence was unusual because she always informed him if she was going to miss work. Chris Davis, another of Hutcherson's employees, called the victim's neighbor, Cynthia Price, to ask her to check on the victim. Price, who was already at work, asked her daughter, Patricia Steinway, to go to the victim's house. When Steinway informed Price that the victim's vehicle was parked in the driveway, Price asked Steinway to get her copy of the victim's house key so Steinway could enter the home to check on the victim.

Steinway first attempted to enter the victim's home through the side door, but the storm door on the outside was locked, and the key did not fit that lock. She next tried to enter through the back door but was unable to gain entry. Finally, Steinway went to the front door of the victim's home, which was not generally used. She discovered that the front door was unlocked, which was unusual. Steinway entered the home and finally found the victim, who was unresponsive and lying on the floor of her bedroom with her face "wrapped in plastic[.]" Steinway immediately called 9-1-1.

Detective Julius Johnson of the East Ridge Police Department testified that he and two other detectives responded to the crime scene just after 11:00 a.m. on June 15, 2011. Detective Johnson said that the deceased victim was lying on her back on the floor of her bedroom with a roll of cellophane plastic wrapped around her face and with her wrists bound behind her back with zip ties. He noted that the victim's purse and wallet were on her bed, along with several cards that had been removed from her wallet. Detective Johnson found a zip tie on the top of the victim's dresser, which was consistent in type and color with the zip ties used to bind the victim's wrists. He also observed a roll of

- 2 -

cellophane in the bedroom that was the same type as the cellophane that was wrapped around the victim's face.

When Detective Johnson went to the victim's kitchen, he noticed that the cupboards had been opened. In the pantry, someone had emptied a box of Glad Press-and-Seal cellophane wrap and had removed the internal roll. Detective Johnson also observed a handprint in a reddish substance on the living room door inside the home. Although officers tried to lift fingerprints from the handprint, they were unable to do so. Gwen Cribbs, a detective with the East Ridge Police Department, stated that the handprint appeared to be paint, rather than blood, because the substance would not lift when the officers tried to collect prints from it.

Sandy Kelley, a fraud investigator with First Bank, explained that the victim had a checking account with First Bank. After the victim's death, Kelley noticed some suspicious transactions, specifically some automated teller machines (ATM) withdrawals and attempts to withdraw money from the victim's checking account. Kelley said that on June 15, 2011, the day of the victim's death, there was a $303 withdrawal from a First Tennessee Bank in Chattanooga, a $202.95 withdrawal from a SunTrust Bank in Chattanooga, and a $102 withdrawal from a Bank of America in Rossville. Kelley also noticed some unsuccessful withdrawal attempts with the victim's debit card on the same date.

Several bank security employees also testified about withdrawals or attempted withdrawals that were made with the victim's debit card. Mitchell Webber, the vice president and security manager for SunTrust Bank in Chattanooga, testified that there was one successful withdrawal with the victim's debit card at a SunTrust branch for $202.95 on June 15, 2011, at 6:51 a.m., and an unsuccessful attempt to use the victim's debit card at a second SunTrust branch on June 16, 2011, at 7:14 a.m. Webber said he provided photographs of these transactions to law enforcement. Timothy Ramsey, a corporate security investigator for First Tennessee Bank, testified that there was a transaction using the victim's debit card at a First Tennessee Bank branch on June 15, 2011. He stated that he provided still photographs, receipts, and a transaction history for the victim's debit card to law enforcement. Amos Frazier, a fraud investigator for Regions Corporate Security, testified that he provided photographs of a transaction with the victim's debit card at a Regions branch at 2:24 p.m. on June 15, 2011.

Chris Moffett, the owner of a construction company, testified that Reed was one of his employees and that Reed had done some repair work for the victim in April or May 2011 while working for him. Moffett said that shortly after the victim's death, the newspaper ran an article that included a bank surveillance photograph of someone using the victim's debit card, and Moffett immediately recognized that the person in the

- 3 -

photograph was Reed, and he contacted the police. Moffett said that Reed was wearing a white shirt and a ball cap in this surveillance photograph. He also noted that Reed drove "a little white midsize . . . sedan type car" and identified Reed's car in some of the ATM surveillance photographs that had already been admitted into evidence. Moffett said he called Reed on June 16, 2011, and tried to convince Reed to meet him so the police could arrest him. He said that the day after this phone call, Reed turned himself into the police.

Daniel Stephenson, an officer in the criminal investigation division of the East Ridge Police Department, testified that he collected evidence at the crime scene. He also went to the home of Reed's parents because Reed was thought to live there. Prior to arriving at this home, Officer Stephenson spoke with Reed's mother, who gave her consent for the officers to search her home. Reed's parents told him that Reed often used the garage and a downstairs bedroom in the house, so he focused his search on these areas. Officer Stephenson noted that the garage contained items that were used by both Reed's parents and Reed. In the garage, he found several zip ties, both black and clear in color. Specifically, he found a 100-count bag of black 8-inch zip ties with 22 zip ties missing. He also found some zip ties in the garage that had been interconnected to create something resembling handcuffs, which was significant because he knew the victim had been bound with zip ties in a "handcuff like fashion." He also found two gardening type gloves on the floor of Reed's bedroom and some additional zip ties inside this bedroom. Officer Stephenson said he attended the victim's autopsy, where zip ties from the victim's wrists, a blood swatch from the victim, and the cellophane that was wrapped around the victim's head were collected. He noted that the zip ties removed from the victim's wrists were the same color and type and had the same letter and number markings as the zip ties inside the 100-count bag that he collected from the Reed's parent's garage.

On June 17, 2011, officers executed the search warrant of Reed's car and his motel room at the Travel Lodge in Chattanooga. Upon searching the motel room, they encountered Reed's ex-wife, Angelia Westerfield. The officers collected a white shirt from a laundry basket in the motel room after Westerfield told them that it was the same white shirt Reed had been wearing in the ATM surveillance photograph that was on the news. When officers searched Reed's car, they found two zip ties on the rear floorboard, a roll of duct tape, and a "quarter wrapper."

Miranda Gaddes, a special agent forensic scientist with the Tennessee Bureau of Investigation (TBI) and an expert in forensic analysis, microanalysis, and physical comparison, testified that her microanalysis of the zip ties recovered from the garage, the zip ties from the bedroom used by Reed, the zip ties found in Reed's car, the zip tie on the victim's dresser, and the zip ties used to bind the victim's wrists revealed that "all the physical characteristics, including the color" and "all of the manufacturing

- 4 -

characteristics, including the logo, the manufacturing mold numbers, and letter[s] that are placed on those, as well as measurements taken of each zip tie were consistent between all of [these zip ties]."

During the investigation into the victim's death, officers obtained a deoxyribonucleic acid (DNA) sample from Reed. Mark Dunlap, a special agent forensic scientist with the TBI and an expert in serology and DNA, later compared Reed's DNA to the DNA collected from different pieces of evidence. Reed could not be excluded as the minor contributor of the partial DNA profile obtained from a wadded piece of Press-and-Seal cellophane wrap found at the crime scene. Agent Dunlap explained that the probability of an unrelated individual having the same DNA mixture profile was 1 in 3 for the African American population, 1 in 3 for the Caucasian population, 1 in 3 for the southeastern Hispanic population, and 1 in 4 for the southwestern Hispanic population. He said there were no DNA markers found on the piece of Press-and-Seal cellophane that were not found in the victim's DNA or Reed's DNA, which meant that there was no evidence of DNA from a third party on this piece of evidence.

Agent Dunlap said the victim's DNA profile was also compared to the DNA collected from the white shirt taken from Reed's motel room, and the major contributor of the DNA on that shirt was consistent with the victim's DNA profile. He said the probability of an unrelated individual having the same DNA profile was 1 in 98,810 for the African American population, 1 in 27,400 in the Caucasian population, 1 in 52,160 for the southwestern Hispanic population.

Finally, Agent Dunlap said Reed's DNA could not be excluded from being a minor contributor to the DNA collected from the zip ties used to bind the victim's wrists. He said the probability of an unrelated individual having the same DNA profile was 1 in 30 from the African American population, 1 in 13 from the Caucasian population, 1 in 15 from the southeastern Hispanic population, and 1 in 22 from the southwestern Hispanic population. He also stated that there were no DNA markers on the zip ties used to bind the victim's wrists that were not found in the victim's DNA or Reed's DNA. Agent Dunlap acknowledged that touch DNA can be transferred, meaning that it can be transferred to one person, and that person can transfer the DNA to another person. During Agent Dunlap's cross-examination, the trial court allowed the defense to conduct a demonstration as to DNA transfer, and Agent Dunlap stated that it was "reasonably likely that some of [the prosecutor's] DNA was transferred to the shirt" during this demonstration."

Dr. James Metcalfe, the chief medical examiner for Hamilton County and an expert in the field of forensic pathology, testified that his office performed the victim's autopsy. After reviewing the documents in his office's file, the written autopsy report,

and the accompanying diagrams, Dr. Metcalfe concluded that the victim's cause of death was "suffocation due to plastic wrap around head." He stated that the Press-and-Seal plastic wrap had been wrapped so tightly around the victim's head that it flattened the victim's nose. He also noted that the victim had blood coming out of her nose as a result of her suffocation. Dr. Metcalfe also asserted that the victim had bruises on her arms and had grooves and scrapes on her wrists, which were caused by her trying to move against the zip ties in an attempt to free herself, and Dr. Metcalfe opined that the victim's death would have been frightening and extremely uncomfortable.

In regard to the defense proof, Linda Reed, the defendant's mother, testified that her son lived with her and her husband at their home on East Stump Street. Mrs. Reed[1] asserted that she and her husband had purchased different types of zip ties for the purpose of securing electrical wiring in the garage and for hanging Christmas decorations. She noted that the prior owner of the East Stump Street house was an electrician, who had left screws, bolts, and zip ties in the garage after he moved out. She explained that there were several different types of zip ties in a white bucket in their garage and that there were five inch zip ties inside drawers mounted to the garage wall.

Mrs. Reed said that on June 15, 2011, she met her son at 6:30 a.m. at Walgreens to collect money for his car payment before she went to work. She knew that her son had spent the previous night at a motel in East Ridge with his ex-wife. Mrs. Reed asserted that in the late afternoon of June 16, 2011, her son called her, "hysterically crying," and informed her that his picture was on the news and that he was a suspect in a homicide. Ms. Reed said her son asked her to pick him up so he could turn himself into the police for questioning, which she did.

The Defendant-Appellant, Randall Kenneth Reed, testified in his own defense. He said that he first became addicted to crack cocaine when he was eighteen or nineteen years old and that his addiction issues resulted in him "stealing things," "burglariz[ing] a business," and committing "various little crimes." Reed said that in 2011, he obtained crack cocaine by calling Milo, his drug dealer.

Reed acknowledged that he had done repair work on the victim's home in May 2011. However, he claimed that he only saw the victim for approximately two minutes while he was at her home and that he did not know her name. Reed said that while he was working at the victim's home, Milo, his drug dealer, brought him crack cocaine, and he smoked it while still on the victim's property.

---

[1] We have referred to this witness as Mrs. Reed to distinguish her from her son, Randall Kenneth Reed, the Defendant-Appellant. Although we have referred to other witnesses by their last name for the sake of efficiency, we intend no disrespect to these witnesses.

- 6 -

Reed said that on the night of June 14, 2011, he stayed at a motel, rather than at his parents' home, so he could smoke crack cocaine without his parents' knowledge. Reed said he purchased the crack cocaine from Milo, who came by his motel room later that night. Reed said that his ex-wife joined him at the motel that night around midnight.

On June 15, 2011, Reed said he awoke early and put gas in his wife's car before she left for work around 5:30 or 5:45 a.m. When he returned to the motel room, he received a phone call on the motel phone from Milo. Milo said he had gotten a debit card and told Reed he would give him crack cocaine if he used this debit card to withdraw money from some ATM machines for him. Reed said he was not concerned about the criminal implications of using this debit card because this was generally a misdemeanor crime that resulted in probation.

Before he left to meet Milo, Reed called his mother because he had money for his car payment. He met her at the Walgreens around 6:20 or 6:30 a.m. on June 15, 2011. After meeting his mother, Reed met Milo at a SunTrust Bank. He got into Milo's vehicle, and Milo gave him the victim's debit card with a sticker that had the PIN number written on it. Reed said that Milo bumped into him when he reached over to open the passenger door with pliers so Reed could get out. Reed then exited Milo's car, successfully withdrew approximately $200 from the SunTrust ATM, and gave Milo the cash, the debit card, and the receipt. Reed said he did not pay attention to the name on the debit card while he was using it to withdraw money. At that point, Reed said Milo informed him that he did not have the crack cocaine on him and asked him to call him later in the day. Reed said he repeatedly called Milo, who finally told him to meet him at a First Tennessee Bank branch. Once Reed got there, Milo asked him to do another ATM withdrawal, and after Reed withdrew the cash and gave Milo the money, the card, and the receipt, Milo gave Reed some crack cocaine, and they left the bank separately. Reed identified both his own car and Milo's sport utility vehicle in one of the bank surveillance photographs that had been admitted.

Reed said that night, Milo called him again, and Reed met him at a Bank of America, where Milo had him withdraw cash from that ATM. Reed acknowledged that during the June 15, 2011 transactions, he was wearing a white shirt, ball cap, and shorts. Later that day, Reed rented a room at a different motel, and Milo visited him there and gave him some more crack cocaine. Still later, Reed met Milo at a Regions Bank, and after Reed's first transaction was unsuccessful, he was able to withdraw money in a second transaction. After that, Reed returned to the motel room to meet his ex-wife. Reed denied ever going to the victim's home on June 15, 2011.

Reed asserted that on the morning of June 16, 2011, after his ex-wife went to work, Milo came to his motel room and drove him to more banks. Reed said that on that day he wore a striped brown shirt and jeans and that he and Milo went to a different SunTrust Bank on Lee Highway. Although Reed attempted to withdraw additional cash at this bank, the debit card did not work, and he returned the card to Milo. Reed left and called his mother for money, which she gave to him. Later, Reed met Milo again so he could get some more crack cocaine and then went back to his motel room, where he smoked crack cocaine and watched television. As he was watching the news, he saw a photograph of him using the victim's debit card in a news story about the victim's death. Reed said that when he heard that someone had died, he "was horrified" and "couldn't believe that something like that . . . happened." He immediately called his mother, crying hysterically, and told her he "didn't understand what was going on[.]" Reed asked his mother to meet him so he could go to the police station for questioning.

Reed said that when Detective Gwen Cribbs later accused him of killing the victim, he replied that he did not know who that was. Reed said he told Detective Cribbs that he got the victim's debit card from a guy named Milo and then provided a physical description of Milo, Milo's cell phone number and address, Milo's grandmother's address, a description of Milo's sport utility vehicle, and a list of places that Milo frequented. Reed said he offered to wear a wire and approach Milo, but Detective Cribbs told him they could not do that and continued to insist that Reed had killed the victim. When Detective Cribbs offered to help him get a reduced sentence, Reed said he told her, "I'm not going to confess to something I did not do." Reed denied ever harming or killing the victim and denied ever being inside the victim's home on June 15, 2011.

Reed acknowledged he was wearing the white shirt that the police had collected from the laundry basket in his motel room and that was in the photograph that was shown on the news. He said he never told Detective Cribbs that Milo brought him crack cocaine at the victim's house; however, he claimed that Detective Cribbs never asked him that question. Reed admitted telling Detective Cribbs that Milo had broken into houses in the past and that he had given Milo information about which houses to target. He also acknowledged that when Detective Cribbs asked him how Milo got access to the victim's house, he replied, "I told him once that . . . [the victim] lived there . . . and that she pretty much stayed by herself . . . [and] I didn't know if anyone else lived there . . . [Milo] was supposed to have just broken in. I didn't know anybody was there or anything."

Reed claimed that the victim's DNA could have gotten on his shirt when Milo reached across him to open his car door with pliers at SunTrust Bank on June 15, 2011, or when Milo bumped into him at the motel. He admitted that he had provided more details about how the victim's DNA had gotten on his shirt at trial than he had at a

previous hearing, when he testified that Milo had bumped into him a few times at the motel.

Reed acknowledged that although he had previously testified on direct examination to only having a theft conviction and burglary conviction and other "little" convictions, he also had a prior convictions for arson, two convictions for felony theft of property in 2001, and convictions for forgery in 2001, bank fraud in 2008, and forgery in 1996.

After Reed's testimony, the defense recalled Detective Cribbs. Detective Cribbs acknowledged that although Reed told her he did not know Milo's last name, he did give her Milo's phone number. She said that after Reed gave her Milo's first name and a physical description, she used a police database program consisting of information from traffic stops, police reports, and field interviews to determine that the description Reed had given for Milo matched a person named Milo Geiger, who was a drug dealer. Despite this database match, Detective Cribbs said that it took her almost two years to obtain an interview with Milo Geiger. She also admitted that although Milo Geiger's DNA was already on file, she did not test Geiger's DNA against the DNA obtained from evidence collected in this case. Ultimately, Detective Cribbs said she cleared Milo Geiger as a suspect; she explained that although Reed claimed Milo called him to withdraw money from the bank ATM machines, the phone records she subpoenaed for Reed and Milo Geiger showed that Reed actually called Geiger multiple times and that Geiger never called Reed. Detective Cribbs said that in light of the lie Reed had told regarding Milo Geiger calling him to set up the ATM withdrawals, she did not feel it necessary to test Geiger's DNA.

Detective Cribbs admitted that when she had asked Reed to set up a drug deal with Milo, Reed agreed to do this while wearing a wire. She recalled talking to her supervisor about this potential drug deal but could not remember whether she had "planned to follow through or not originally." Detective Cribbs acknowledged that Reed initially told her he was not the victim's killer. Although defense counsel suggested during cross-examination that Milo Geiger was a different individual than the Milo identified by Reed, Detective Cribbs insisted that Milo Geiger was the same Milo with whom Reed had offered to do a drug deal in light of Reed's description of Milo, the fact that Milo Geiger was a known drug dealer in Chattanooga, and the proof regarding Reed's numerous phone calls to Milo Geiger at the time of the first ATM withdrawal.

After hearing the proof presented at trial, the jury convicted Reed of first degree premeditated murder, first degree felony murder, aggravated robbery, and theft of property. The trial court merged the first degree felony murder conviction with the first degree premeditated murder conviction and imposed a sentence of life imprisonment.

Following a sentencing hearing, the trial court imposed a twenty-year sentence for the aggravated robbery conviction and an eleven-month-and-twenty-nine-day sentence for the theft of property conviction, which were to be served concurrently to one another and concurrently to Reed's sentence of life imprisonment. The trial court entered the judgments for the first degree premeditated murder and first degree felony murder convictions on July 20, 2018, and entered the judgments for the aggravated robbery and theft convictions on October 8, 2018.

Reed filed a timely motion for new trial[2] as well as an amended motion for new trial. Following a hearing, the trial court entered an order denying the motion for new trial on April 5, 2019. On May 3, 2019, Reed filed a timely notice of appeal.

## ANALYSIS

**I. Right to Self-Representation.** Reed contends that the trial court erred in denying his request to represent himself. He claims he "made a clear and unequivocal oral motion for self-representation and later sought self-representation through a valid Motion to Dismiss Attorney, asking for advisory counsel in the alternative of being granted new counsel." Reed, while declaring that "legal knowledge is not a prerequisite to self-representation," nevertheless asserts that he was capable of representing himself because he knowingly and voluntarily entered a guilty plea, even a mid-trial plea, because he understood the factual basis required for guilty pleas, and because he demonstrated his ability to identify and raise certain issues with the court by filing several pro se motions. Reed insists that because the trial court's denial of his right to self-representation was a structural constitutional error not amenable to harmless error review, he is entitled to an automatic reversal of his convictions. See State v. Hester, 324 S.W.3d 1, 30 (Tenn. 2010).

In response, the State contends that while Reed made two requests to dismiss his attorney, the record shows that neither of these requests amounted to a clear and unequivocal written request to represent himself at trial. Contra State v. Michael A.

---

[2] "[W]here there is a single trial for felony murder and the underlying felony, and where the sentences are entered on different days, we interpret Rule 33(b) as to require a motion for new trial to be filed within thirty days of the day the last sentence is entered.'" State v. Hatcher, 310 S.W.3d 788, 801 (Tenn. 2010) (quoting State v. Bough, 152 S.W.3d 453, 460-61 (Tenn. 2004)). Because Reed's motion for new trial was filed within thirty days of entry of the aggravated robbery and theft convictions, which were the last sentences entered, we conclude that his motion for new trial was timely as to both the murder convictions and the aggravated robbery and theft convictions. Accordingly, we will consider Reed's issues on the merits.

<u>Alderson</u>, No. M2015-01395-CCA-R3-CD, 2016 WL 5543266, at *8 (Tenn. Crim. App. Sept. 29, 2016) (noting "that the written waiver is required only in the event that the defendant is permitted to proceed pro se" and that "[t]here is no requirement that the <u>request</u> for permission to waive the right to counsel and proceed pro se be in writing"). We conclude that the trial court did not err in denying Reed's requests to represent himself.

Initially, we recognize that a criminal defendant has the right to be represented by counsel or the right to represent himself and proceed pro se without the assistance of counsel. U.S. Const. amend. VI; Tenn. Const. art. I, § 9; <u>see</u> <u>Hester</u>, 324 S.W.3d at 30; <u>State v. Holmes</u>, 302 S.W.3d 831, 838 (Tenn. 2010); Tenn. R. Crim. P. 44(a) ("Every indigent defendant is entitled to have assigned counsel in all matters necessary to the defense and at every stage of the proceedings, unless the defendant waives counsel."). The right of self-representation exists "'despite the fact that its exercise will almost surely result in detriment to both the defendant and the administration of justice.'" <u>State v. Antonio McMiller</u>, No. E2015-01597-CCA-R3-CD, 2016 WL 3947878, at *3 (Tenn. Crim. App. July 18, 2016) (quoting <u>State v. Fritz</u>, 585 P.2d 173 (Wash. Ct. App. 1978)). The issue of whether a defendant has exercised his right of self-representation and has simultaneously waived his right to counsel is a mixed question of law and fact that this court reviews de novo, accompanied by a presumption that the trial court's factual findings are correct. <u>Hester</u>, 324 S.W.3d at 29-30. "An error in denying the exercise of the right to self-representation is a structural constitutional error not amenable to harmless error review and requires automatic reversal when it occurs." <u>Id.</u> at 30 (citing <u>State v. Rodriguez</u>, 254 S.W.3d 361, 371 (Tenn. 2008)).

In order to exercise the right of self-representation, a defendant must waive his right to counsel, and this waiver may occur at any stage of the proceedings. <u>Id.</u> However, "[c]ourts should indulge every presumption against waiver of the right to counsel." <u>Lovin v. State</u>, 286 S.W.3d 275, 287 n.15 (Tenn. 2009) (citing <u>Brewer v. Williams</u>, 430 U.S. 387, 404 (1977); <u>State v. Worrell</u>, 660 S.E.2d 183, 185 (N.C. Ct. App. 2008); <u>Williams v. State</u>, 252 S.W.3d 353, 356 (Tex. Crim. App. 2008); <u>State v. Vermillion</u>, 51 P.3d 188, 192-93 (Wash. Ct. App. 2002)). Courts have typically "assigned a constitutional primacy to the right to counsel over the right of self-representation." <u>Hester</u>, 324 S.W.3d at 30.

In order to exercise the right of self-representation, "(1) a defendant must make the request in a timely manner; (2) the assertion of the right of self-representation must be clear and unequivocal; and (3) the assertion of the right of self-representation must reflect a knowing and intelligent waiver of the right to counsel." <u>Id.</u> at 30-31 (citing <u>State v. McCary</u>, 119 S.W.3d 226, 256 (Tenn. Crim. App. 2003); <u>State v. Herrod</u>, 754 S.W.2d 627, 629-30 (Tenn. Crim. App. 1988); <u>United States v. Bush</u>, 404 F.3d 263, 271 (4th Cir.

2005); United States v. Mackovich, 209 F.3d 1227, 1236 (10th Cir. 2000)).  Before accepting a waiver of the right to counsel, the trial court must advise the accused in open court of the right to assistance of counsel at every stage of the proceedings and must "determine whether there has been a competent and intelligent waiver of such right by inquiring into the background, experience, and conduct of the accused, and other appropriate matters."  Tenn. R. Crim. P. 44(b)(1).  The defendant's waiver of the right to counsel must be in writing and must be included in the record.  Tenn. R. Crim. P. 44(b)(2), (b)(3).  "[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to waive the right, not the competence to represent himself."  Godinez v. Moran, 509 U.S. 389, 399 (1993) (footnote omitted).  "[A] criminal defendant's ability to represent himself [or herself] has no bearing upon his [or her] competence to choose self-representation"  Id. at 400 (footnote omitted).

However, "[t]he right of self-representation is not absolute."  Hester, 324 S.W.3d at 31.  Even if a defendant's invocation of the right of self-representation meets the aforementioned requirements, "the effectiveness of the defendant's invocation and waiver is not a foregone conclusion."  Id.  Notably, there is no right of self-representation when a defendant "seeks to abuse the dignity of the courtroom or to engage in serious obstructionist misconduct."  Id. (citing Indiana v. Edwards, 554 U.S. 164, 171 (2008)).  Moreover, defendants are not allowed to use the right of self-representation "'as a tactic for delay, for disruption, for distortion of the system, or for manipulation of the trial process.'"  Id. (quoting United States v. Mosley, 607 F.3d 555, 558 (8th Cir. 2010)).

In State v. Hester, the trial court declined to allow the defendant to represent himself.  Id. at 28-29.  On appeal, the Tennessee Supreme Court held that while the trial court's concerns about the defendant's lack of knowledge of the law and lack of competence as a communicator and advocate did not support the denial of the defendant's request to represent himself, the trial court's finding that the defendant's attempting to manipulate the judicial system did provide adequate support for the trial court's denial of the request for self-representation.  Id. at 33.  After detailing the trial court's ruling concerning this denial, the Hester court stated, "We understand the trial court's ruling as reflecting its conclusions that Mr. Hester was trying to manipulate the process to obtain a new lawyer or to have [his former lead attorney] reappointed as lead counsel and that Mr. Hester did not have a genuine desire or intent to represent himself at trial."  Id.

- 12 -

In this case, Reed made two attempts to dismiss his trial attorney. Reed's first pro se motion[3] was entitled "Motion to Appoint New Counsel. At the March 23, 2018 hearing on this motion, Reed asked the trial court to dismiss one of his defense attorneys because he claimed she had failed to meet with him and had discussed his case with other inmates. Reed's defense attorney assured the trial court that she had not talked to anyone, other than Reed, about Reed's case. She also asserted that she had tried to visit Reed the prior week, but Reed had refused to talk to her. Reed eventually admitted that he had, in fact, refused to speak to defense counsel; however, he claimed that he had to write the Board of Professional Responsibility in order to get her to visit him. Defense counsel then declared that Reed would not talk to her about the investigation she had done in his case or about the motions she had filed. She asserted that she had "scrutinized the trial transcript [from Reed's first trial] many, many times" and that she was very familiar with the case because she had successfully obtained a reversal of Reed's murder conviction from his first trial. The trial court acknowledged the difficulty in having a murder conviction reversed on appeal and then stated, "I don't see right now, Mr. Reed, a basis to grant your motion. If you're not cooperating with counsel, that's not counsel not doing her job." When Reed claimed that defense counsel was not cooperating with him either, the following exchange occurred:

> Defense counsel: Judge, I was not even aware there was an issue at all until . . . I went to see [Reed] last week and he wouldn't speak to me. But he indicated to me, I told him that the Court was probably—based on how the Court generally operates, would probably be disinclined to appoint new counsel. And he said that he would represent himself, and he was not going to allow me to do it. So I'll do whatever the Court wants me to do. Of course, despite the Board complaint, I don't have any animosity toward Mr. Reed. I'll do whatever the Court thinks is best.

> Trial court: Okay. Well, what I want to do, I haven't heard anything today that would require appointment of new counsel on the case. It may be that if there's a further need for communication on the case or an update from Mr. Reed, I'm certain that can happen going forward on it.

---

[3] Although this motion is not included in the technical record, a minute entry filed on March 23, 2018, states that the trial court denied Reed's pro se Motion to Appoint New Counsel. In addition, the transcript of this motion hearing is included in the appellate record.

- 13 -

All right, Mr. Reed, anything else?

Reed:          Yes, sir.  If you're not going to remove her from the case, I'll just defend myself.  If you're not going to appoint me new counsel.

Trial court:   Your trial date is going to stay where it's set.  So this Court does not play games with appointment of counsel.  We're on, you know, a couple of months before the trial goes [and] then all of a sudden we have [a request for] new counsel.

               You have given me no basis at all to relieve counsel on your case.

Reed:          Oh, so, it's fine for . . . counsel to talk to other inmates about my case.

Trial court:   I don't believe that happened.  Honestly, I just don't.

               I know [defense counsel].  [Defense counsel] is bound by ethical responsibilities.  I just don't believe that [your attorney] is out there talking about [your] case.

               Now, if you want to have people brought in and put evidence on, I'm happy to do that.

Reed:          Yeah, I can have signed affidavits from them if you need that.

Trial court:   I think I do.  Because I am not going to presume that [defense counsel] is out there talking about your case.  She has ethical duties not to do so.  And if she has violated her ethical duties in that regard it'd be the first I've heard of it.

Reed:          That's why I filed with the Board of Professional Responsibility about it.

- 14 -

Defense counsel:     They just turn it into a consumer assistance complaint and just . . .

Trial court:         Yes, okay.

                     Mr. Reed, I don't have any other motions before me today so I'm not going to relieve [defense counsel] on the case, and I'm going to keep the case set for trial. If there are other issues we need to take up, you all let me know.

After the parties talked about whether defense counsel would file a motion for bond, defense counsel, the trial court, and Reed had the following discussion:

Defense counsel:     Just two more quick matters. One is just for clarification. Mr. Reed has not indicated to me anything other than the fact that he is maintaining his innocence and wants a trial. So there's not anything for me to even discuss with anyone else other than, I mean, obviously this case is public record.

Trial court:         [Defense counsel], in the absence of any other evidence, I would not presume that you're talking with others about the case. I would not even presume that. I mean, I know that you have ethical duties that would prevent you from doing that. I know that you are an ethical lawyer and follow those duties. Absent any other proof, no, I don't credit that.

Defense counsel:     Okay. Thank you.

                     And secondly, so for now I am on the case whether—I mean, even though . . . he's insisting he represent[] himself . . . I am still on the case; correct?

Trial court:         You are representing Mr. Reed on the matter. The case is set for trial. There are no other motions before the Court presently.

| | |
|---|---|
| Defense counsel: | Yes, sir. |
| Trial court: | Okay. |
| | All right, Mr. Reed, thank you very much. Motion denied. Passed to pretrial conference. |

On April 11, 2018, Reed filed a second pro se motion, entitled "Motion to Dismiss Attorney," wherein he complained that defense counsel did not come to see him enough, that she stayed only ten to fifteen minutes when she did meet with him, that she did not provide any information on his case, and that she had not filed motions she promised to file in his case. In this second motion, Reed asked the trial court "to dismiss [defense counsel] from [his] case and ap[p]oint a new attorney or let [him] defend [him]self with [the] help of anothe[r] attorney."

At the April 20, 2018 hearing on this second motion, Reed claimed that defense counsel had not filed the bond motion she promised to file at the March 23, 2018 hearing and that defense counsel had not visited him since that hearing. Defense counsel replied that she had filed the bond motion and had gone to see Reed twice since the last hearing but had been unable to gain access to the jail because it was understaffed. She also said that she had been interviewing witnesses for Reed's trial. At that point, the following conversation occurred:

| | |
|---|---|
| Trial court: | . . . Mr. Reed, it sounds like work is being done on your case. If [defense counsel] were to come out to visit you a little more often do you think that would . . . solve the issue? |
| Reed: | Yeah, because I mean—yeah, I have a lot of things I need to go over with her, but I don't ever—I can't ever, you know, meet with her or anything. |
| Trial court: | Right. Okay. All right. |
| Reed: | And, I mean, she said she filed [the] bond motion. I mean, I just filed this [motion] April 11th and we're already hearing my motion. |

| | |
|---|---|
| Trial court: | Well, that's because I put you up specifically. Typically when motions are filed in my court, I put them off to a conference. I don't bring them up typically. This is a very special case because your trial is coming ready on July 17th so that's why I fast-tracked this one. Typically we have a built-in schedule so the motions that are filed are put off unless there's an earlier request to set it, . . . so that's what happened here. There's no magic that you filed motions and they're on the docket and she files motions and they're not. It's just because I put you on the docket specifically to have the discussion.<br><br>So, [defense counsel], I know that you are making efforts to go see Mr. Reed. |
| Defense counsel: | Yes, sir. |
| Trial court: | Could you continue to make those efforts so that any concerns or input that he has can be assuaged? |
| Defense counsel: | I certainly will, Judge. |

After discussing a hearing date for the bond motion, the trial court stated, "So, Mr. Reed, very respectfully I'm going to deny your motion to relieve counsel and to appoint new counsel, but I think we're all on the same page here."

At the motion for new trial hearing following Reed's second trial, Reed testified that when his first pro se motion was heard, he asked to represent himself, but the trial court left defense counsel on the case and "denied his right" to defend himself. Reed admitted that at the hearing on his second pro se motion, he agreed to keep defense counsel as long as she did the things he asked; however, he claimed that he "didn't have a choice" because the trial court was "not going to dismiss her." Appellate counsel argued that Reed was capable of representing himself because he had filed over five pro se motions in this case, which prompted the trial court to make the following ruling:

> The filing of pro se motions is something that the Court encounters regularly. That, in and of itself, is not a clear and unequivocal assertion of the right to represent himself. The Court does not recall the circumstances

that Mr. Reed testifies to today. Very candidly, the record will speak for itself in that regard.

But, in any event, even if an . . . unequivocal waiver of the right to counsel and assertion of the right of self[-]representation occurred earlier in the case, when the Court held a hearing on the motion itself, on the motion that was styled as an alternative request, Mr. Reed did no[t] assert his right to self-representation at all. And, in fact, the Court made specific inquiry to Mr. Reed whether the measures that the Court had taken to ensure his representation by counsel were sufficient to solve his issue, he confirmed in open court that it was.

The Court does not credit, to the extent that it matters, his now self-serving statement that he thought it was futile [to assert his right of self-representation on the second motion, which] was in response to a leading question.

We note that at the March 23, 2018 hearing on Reed's first pro se "Motion to Appoint New Counsel, Reed initially complained that defense counsel would not meet with him but later admitted that he refused to talk to defense counsel when she tried to meet with him. Reed also acknowledged that he filed a complaint with the Board of Professional Responsibility against defense counsel. When the trial court recognized that defense counsel had accomplished a difficult feat in getting Reed's convictions reversed and indicated that it would not grant the motion for new counsel, Reed suddenly declared, "If you're not going to remove [defense counsel] from the case, I'll just defend myself. If you're not going to appoint me new counsel." Upon hearing this, the trial court quickly informed Reed that it "d[id] not play games with appointment of counsel" and that "[w]e're . . . a couple of months[4] before the trial goes [and] then all of a sudden we have [your request for] new counsel." The court also made a specific finding that Reed's claim that defense counsel had talked to other inmates about his case was not credible.

We acknowledge that defendants "are free to seek to invoke a right of self-representation as an alternative should their request for the appointment of a different attorney be denied." Id. at 33. Nevertheless, we understand the trial court's statements at the March 23, 2018 hearing to be a finding that Reed did not genuinely want to represent himself and was simply manipulating the judicial process in order to have a new attorney

---

[4] The record shows that at the time the trial court made this statement, Reed's trial was set for July 17, 2018.

appointed to his case or to delay his trial. Cf. State v. Carruthers, 35 S.W.3d 516, 546 (Tenn. 2000) (noting that the right to counsel "does not include the right to appointment of counsel of choice, or to special rapport, confidence, or even a meaningful relationship with appointed counsel"). "Disingenuous invocations of the right of self-representation that are designed to manipulate the judicial process constitute an improper tactic by a defendant and are not entitled to succeed." Hester, 324 S.W.3d at 33 (citing United States v. Welty, 674 F.2d 185, 187 (3d Cir. 1982)). We also recognize that "[a] court may deny a manipulative request for self-representation, distinguishing between a genuine desire to invoke a right of self-representation and a manipulative effort to frustrate the judicial process. Id. (citing United States v. Bush, 404 F.3d 263, 271 (4th Cir. 2005); United States v. Frazier-El, 204 F.3d 553, 560 (4th Cir. 2000); Edwards v. Commonwealth, 644 S.E.2d 396, 400 (2007); People v. Marshall, 931 P.2d 262, 272 (1997)). In analyzing this issue, we conclude that the evidence in the record does not preponderate against the trial court's finding that Reed did not have a genuine desire to represent himself and was only making this request to manipulate the judicial process. See id. at 34. We, like the Hester court, "are wary of creating incentives for defendants to use a request for self-representation as a subterfuge when they lack a genuine desire or intent to represent themselves." Id. Accordingly, we conclude that the trial court did not err in denying Reed's March 23, 2018 request to represent himself.

We note that at the April 20, 2018 hearing on Reed's second pro se motion, which was entitled "Motion to Dismiss Attorney," Reed initially asked the trial court to dismiss defense counsel and appoint a new attorney or let him defend himself with the help of another attorney. However, upon questioning by the trial court, Reed immediately acknowledged that his issues with defense counsel would be resolved if she agreed to meet with him more often. Consequently, we can easily conclude that Reed's request for self-representation at the April 20, 2018 hearing was not clear and unequivocal, as is required. For all these reasons, we conclude that the trial court did not err in denying Reed's requests to represent himself.

**II. Denial of Motion to Suppress.** Reed also argues that the trial court erred in refusing to reconsider his motion to suppress the evidence found during the search of the "garage apartment" at his parent's home. He asserts that his mother had no authority to consent to the search of this garage apartment. Relying on proof he presented at the motion for new trial hearing following his second trial, Reed argues he had a possessory interest in and the right to exclude his parents and others from the "garage apartment" where zip ties and "non-illegal items" were recovered because he had a lock on the door and paid rent for this space. Reed also asserts that the trial court erred in failing to reconsider his motion to suppress because his attorney in his first appeal never raised the

issue that he had a reasonable expectation of privacy in his "apartment" pursuant to the factors in State v. Talley, 307 S.W.3d 723, 731 (Tenn. 2010).[5]

The State counters that because the motion to suppress in this record is the same as the suppression motion that was denied prior to Reed's first trial, the trial court properly considered the motion as a motion to reconsider, and Reed has failed to show how the trial court erred in refusing to reconsider its previous ruling. The State further asserts that even if Reed has shown that the trial court erred in failing to reconsider the motion, the appellate record does not show that the trial court's refusal to reconsider the motion to suppress was harmful. We conclude that the trial court did not abuse its discretion in refusing to reconsider Reed's motion to suppress.

On December 4, 2017, following the remand of this case but prior to his second trial, Reed filed a "Motion to Suppress," seeking to suppress "any and all evidence obtained by police during and after the unconstitutional search of [his] garage apartment at . . . E. Stump St., East Ridge, Tennessee on June 17, 2011[,] in violation of the Fourth Amendment to the United States Constitution and Article I Section 7 of the Tennessee Constitution." In this motion, Reed asserted that he had "rented this garage apartment from his parents, paid monthly rent, and maintained a separate lock on same" and that "his mother had no authority to consent to police search of same." Reed also contended that the "consent to search signed by his mother authorized the seizure only of 'stolen or contraband items'" and that because he was already in custody, "no exception existed relating to his probationary status."

At the June 22, 2018 pre-trial hearing on this motion, the trial court said that it had done "significant research" on whether it had the discretion to reconsider the suppression ruling made by a different judge prior to Reed's first trial and, if so, whether it should exercise such discretion. The court noted that "the Rules of Criminal Procedure do not recognize motions to reconsider." Nevertheless, the trial court asserted that State v. Ryan, 756 S.W.2d 284, 285 (Tenn. Crim. App. 1988), recognized a trial court's inherit power to reconsider its own prior decisions.

---

[5] In determining whether there is a reasonable expectation of privacy in this context, this court applies a totality of the circumstances test and the following seven factors: (1) [whether the defendant owns the property seized]; (2) whether the defendant has a possessory interest in the thing seized; (3) whether the defendant has a possessory interest in the place searched; (4) whether he has a right to exclude others from that place; (5) whether he has exhibited a subjective expectation that the place would remain free from governmental invasion; (6) whether he took normal precautions to maintain his privacy; and (7) whether he was legitimately on the premises. Talley, 307 S.W.3d at 731 (internal citations and quotations omitted).

The trial court also considered the federal authority on this issue. Citing the Christianson case, the court recognized that "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" Christianson v. Colt Inus. Operating Corp., 486 U.S. 800, 817 (1988) (quoting Arizona v. California, 460 U.S. 605, 618 n.8 (1983)). The trial court also referenced the Gillig case, which recognized that

> "[i]t would be utterly destructive . . . if each successive decision resulted in the reconsideration of every previous one, and a sequence of decisions in the same case based on different views of overlapping issues of law would likely result in an internally inconsistent judgment. To avoid the horns of this dilemma, it is the practice to treat each successive decision as establishing the law of the case and depart from it only for convincing reasons."

Gillig v. Advanced Cardiovascular Systems, Inc., 67 F.3d 586, 589-90 (6th Cir. 1995) (quoting James W. Moore et al., Moore's Federal Practice ¶ 0.404[4.-1]). In addition, the trial court found persuasive the holding in Gillig: "[W]hen a case is transferred from one judge to another, it is important that the transferee judge does not hastily disturb the rulings of the transferor judge, inasmuch as the utility of such a transfer would be seriously compromised if the fact of transfer were to be treated as an invitation to seek a second opinion on every pre-transfer ruling . . . ." Id. at 590 (citation and internal quotation marks omitted). The trial court noted that while Reed's case had not been transferred from another division of criminal court, the situation in this case was "analogous" because the trial court, as successor judge, had to decide whether to reconsider a decision made by the prior judge who presided over Reed's first trial. Taking into account the aforementioned law, the trial court asserted that it believed the proper standard was "whether reconsideration would be in the interest of justice."

However, the trial court also recognized that "there may be even perhaps a duty to reconsider a suppression issue." The court specifically referenced Rouse v. United States, 359 F.2d 1014, 1015-16 (D.C. Cir. 1966), which held that if "[n]ew facts, new light on the credibility of government witnesses, or other matters appearing at trial . . . cast reasonable doubt on the pretrial [suppression] ruling," then it "becomes the duty of the trial judge to consider de novo the issue of suppression and, if necessary, hold a hearing out of the presence of the jury." In addition, the trial court acknowledged that

"reconsideration [of a suppression ruling] may be necessary when the law is changed or [when a] previous [decision] is clearly erroneous or [not in the interest] of justice."

The trial court, after reviewing the aforementioned the law, then made the following findings:

> In this case as the Court looked back through the motions that were previously filed as well as the new arguments that have been raised, the Court does not find the presence of extraordinary circumstances that would cause this Court to reconsider the previous rulings. Based upon the factors that the Court has identified earlier, the Court doesn't believe that there would be a duty to reconsider. The Court is particularly persuaded in what's mentioned in [Waste Management of Ohio, Inc. v. City of Dayton, 169 Fed. Appx. 976, 987 (6th Cir. 2006),] that to allow reconsideration without extraordinary circumstances following the first appeal of the case [yields inconsistent] results. The Court very much agrees with the 6th Circuit['s conclusion in Waste Management of Ohio] that it would be [absurd] that a party who has chosen not to argue [a point] on first appeal should stand better [as] regards the law [of the] case [than one who had argued and lost]. Although our appellate courts may take a different view, under the circumstances of this case[,] perhaps the Court finds the [Waste Management of] Ohio case particularly persuasive.

> So the Court would deny reconsideration of the other motions.

At the motion for new trial hearing following Reed's second trial, appellate counsel presented proof from Reed, who testified that he paid $350 a month in rent to his parents and that he kept a separate lock on his room, to which his parents did not have access. After hearing this proof, the trial court noted that the defense had the "opportunity . . . to have offered that evidence" when the suppression motion was originally litigated prior to Reed's first trial. It also noted that Reed, in his appeal following his first trial, never raised a Fourth Amendment issue regarding the trial court's denial of his motion to suppress. When appellate counsel asserted that a failure to raise this issue on appeal would not bar Reed from raising it at this time, the trial court stated, "The real issue is whether this Court now has acted outside of its discretion in refusing to reconsider a motion. Not whether the Fourth Amendment issue on its substance is there[.]" The trial court reiterated much of the case law on which it relied at the June 22, 2018 hearing, and then the following discussion transpired:

| | |
|---|---|
| Trial Court: | So is . . . the issue here really a 4th Amendment issue, or is [it] whether the Court acted outside of its discretion in failing to reconsider the previous issue after it was not challenged on appeal? |
| Defense Counsel: | I do believe that it goes to the heart of the 4th Amendment violation, Your Honor.  If that is the state of the law that because it was not raised on first appeal, that it is now I guess [in a] sense, waived, and/or [defense counsel] may have also waived argument as to extraordinary circumstances[,] despite the likelihood of new evidence which may have changed this Court's opinion.  It is beginning to sound to me like that is more of a [post-conviction] issue[,] which may be raised at a later date[,] than it is [a] motion for new trial [issue], Your Honor. |
| Trial Court: | I'm not certain the Court's holding [is] that it's waived.  But I think the Court's holding previously was that there were not extraordinary circumstances such as the one the Court identified earlier that would have required reconsideration on the first issue. |

At the conclusion of this discussion, the trial court denied relief on this ground.

We recognize that "[a] motion to reconsider or to reopen the proof taken at a suppression hearing is a matter within the sound discretion of the trial court, and this Court will not interfere with that discretion absent a showing that an injustice occurred as a result of the denial of the motion." State v. McClure, 74 S.W.3d 362, 368 (Tenn. Crim. App. 2001) (citing State v. Moore, 775 S.W.2d 372, 375 (Tenn. Crim. App. 1989); State v. Bell, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985)).  Before an "injustice" can be said to have transpired due to the denial of such a motion, "it must be established by the party aggrieved that the evidence sought to be introduced would establish that a different result would probably be reached by the trial judge in the resolution of the motion to suppress." Moore, 775 S.W.2d at 375 (citing Bell, 690 S.W.2d at 882).

Here, Reed maintains that if the trial court had agreed to reconsider his motion to suppress, then it would have reached a different result regarding the suppression motion. The record shows that at the motion for new trial hearing following Reed's second trial,

the trial court allowed Reed to present proof about his claimed privacy interest in the room at his parent's home and the right to exclude his parents and others from this room. However, the trial court ultimately held that no extraordinary circumstances existed that would cause it to reconsider the suppression ruling made by the prior judge assigned to Reed's first trial.

The appellate record from Reed's first appeal shows that the parties had a "pretrial suppression hearing" concerning Reed's claim that he "paid rent and therefore his mother could not voluntarily consent" to a search of his room. Accordingly, this record clearly establishes that Reed raised these same suppression issues prior to his first trial but failed to include them in his first appeal. See Rouse v. DaimlerChrysler Corp., 300 F.3d 711, 715 (6th Cir. 2002) (noting that the law of the case doctrine, which generally prevents reconsideration of claims that have been decided at a previous stage in the same litigation, "also bars challenges to a decision made at a previous stage of the litigation which could have been challenged in a prior appeal, but were not"). Although Reed was hopeful that the successor judge assigned to his second trial would be more inclined to suppress this evidence than the prior judge had been, the successor judge had no obligation to do so. See Christianson, 486 U.S. at 817 ("A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." (citation and internal quotation marks omitted)); Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd., 975 S.W.2d 303, 306 (Tenn. 1998) (recognizing that the law of the case doctrine "is not a constitutional mandate nor a limitation on the power of a court" but "is a longstanding discretionary rule of judicial practice which is based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited").

After considering the proof presented in conjunction with the Talley factors, we conclude that Reed has failed to establish that this proof would have caused the successor judge to reach a different result as to his suppression motion. The record indicates that Reed's mother, who lived with her husband at the home on East Stump Street, had common authority over the premises and had the authority to consent to the search of Reed's bedroom. "Common authority is defined as the 'mutual use of the property by persons generally having joint access or control . . . so that it is reasonable to recognize that any of the co-habitants has the right to permit [an] inspection . . . and that the others have assumed the risk . . . ." Talley, 307 S.W.3d at 734 (quoting United States v. Matlock, 415 U.S. 164, 171 n.7 (1974)); see State v. Ellis, 89 S.W.3d 584, 593 (Tenn. 2000) ("The State may satisfy its burden of proof in this regard either by demonstrating that the third party in fact possessed common authority as defined above or, alternatively, by demonstrating that the facts available to the searching police officers would have

warranted a man of reasonable caution in the belief that the consenting party had authority over the premises." (citations and internal quotation marks omitted)). After considering this case law, it is evident that no injustice occurred in this case. Accordingly, we conclude that the trial court did not abuse its discretion in refusing to reconsider Reed's suppression motion.

**III.** **Sufficiency of the Evidence.** Next, Reed argues that the evidence is insufficient to sustain his convictions. Although he does not challenge the evidence supporting the elements of each of the conviction offenses, he does contend that the State failed to establish his identity as the perpetrator of these offenses beyond a reasonable doubt. The State counters that there was sufficient evidence to prove that Reed was the perpetrator in the victim's murder and robbery in light of the DNA, surveillance, and microanalytical proof that was presented at trial. We agree with the State that the evidence is sufficient to sustain all of Reed's convictions.

At the motion for new trial hearing following Reed's second trial, appellate counsel argued that the evidence was insufficient to sustain Reed's identity as the perpetrator in this case. Specifically, he claimed the evidence was insufficient "based on the trial testimony, based on the incomplete investigation by the [Chattanooga Police Department] into other potential culprits, based on the fact that these zip ties are ridiculously common, . . . based on the fact that it is being more and more acknowledged by the bar and by scientists every day . . . that secondary and tertiary DNA transfers are becoming more and more of a problem." In considering this ground, the trial court noted that it allowed "a demonstration [to the jury of DNA transfer] over the vigorous objection of the State[,]" and that the jury "rejected the [defense] theory" and "rejected [Reed's] credibility." The trial court, recognizing that legal sufficiency is "a deferential standard after the verdict," ruled that "the proof is legally sufficient to support [Reed's] conviction[s]."

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State

v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

"[T]he perpetrator's identity is an essential element of every criminal offense." State v. Bell, 512 S.W.3d 167, 198 (Tenn. 2015) (citing Rice, 184 S.W.3d at 662). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. Bell, 512 S.W.3d at 198 (citing State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005)). In resolving questions of fact, including determining the identity of a perpetrator, "'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" State v. Pope, 427 S.W.3d 363, 369 (Tenn. 2013) (quoting State v. Hornsby, 858 S.W.2d 892, 897 (Tenn. 1993)).

Here, Reed challenges only the sufficiency of the evidence establishing his identity as a perpetrator in this case; therefore, we will not detail the elements of each of the conviction offenses. Reed maintains that he was not at the victim's home at the time she was murdered and that the DNA evidence admitted at trial never linked him to the crimes. Specifically, he claims there was no proof linking him to the cellophane wrapped around the victim's head and "[a]t best, the State could only demonstrate that [he] 'could not be excluded'" from the DNA profile found on the zip-tie on the victim's wrists, which he claims represented a "7.7% chance[6] of misidentification." He also asserts that the lead detective failed to test the "on-file DNA of a second suspect," presumably Milo Geiger, and that the police failed to gather other potential DNA samples from the scene and failed to properly follow up on "a second, known potential suspect," also presumably Geiger, whom Reed claims possessed the victim's debit card before giving it to him. Reed insists that he presented proof at trial regarding the possibility of tertiary DNA transfer among the victim, this other suspect, and him. Reed also claims that the presence of zip ties in his car can be explained by the fact that he worked in construction and that the zip ties were used for electrical purposes around his parents' home and garage. In addition, he claims that the similarities between the zip ties from his car and the ones on the victim's wrists show "at best that the zip ties, which are common use to individuals even outside of electrical or construction jobs, have consistencies due to factory manufacturing." Reed argues that "[w]ithout further proof that [he] was tied to anything

---

[6] Agent Dunlap actually testified that the probability of an unrelated person having the same DNA profile as the DNA found on the zip-ties used to bind the victim's wrists was 1 in 13 from the Caucasian population, which represents a 7.14% chance that Reed did not deposit the DNA found on this piece of evidence.

beyond having a smudge of . . . the victim's makeup on his shirt and possession and use of [the victim's] stolen [debit] card as pled to by [him]," this court should reverse his convictions.

At trial, the State presented strong proof of Reed's identity as the perpetrator. The white shirt the police recovered from the motel room in which Reed stayed the night of June 15, 2011, contained DNA that was consistent with the victim's DNA profile. Although Reed argued at trial that the victim's DNA on his shirt could be explained by "tertiary DNA transfer," the State is entitled to all reasonable inferences that may be drawn from this evidence, including the inference that Reed got the victim's DNA on his shirt when he perpetrated the crimes against the victim. See Davis, 354 S.W.3d at 729. The evidence also showed that Reed could not be excluded as a minor contributor of the DNA samples collected from the wadded piece of cellophane and the zip ties used to bind the victim's wrists, and there was no DNA on these items that belonged to anyone other than Reed and the victim. Moreover, several surveillance photographs admitted at trial showed that Reed, who was wearing the same white shirt collected by the police, used the victim's debit card on the day of the victim's murder to withdraw money from several ATM machines. Although Reed claimed that Milo, his drug dealer, gave him the victim's debit card and that Reed used this card in exchange for crack cocaine, the jury clearly rejected this defense theory with its verdicts. Finally, the State presented proof that the zip ties used to bind the victim's hands were a microanalytical match to the zip ties collected from Reed's car as well as the bedroom and the garage used by Reed. In total, the evidence at trial showed that a DNA profile consistent with the victim's DNA was found on Reed's shirt, that Reed could not be excluded as a minor contributor of the DNA on the cellophane or zip-ties at the crime scene, that Reed possessed and used the victim's debit card the day she was murdered, and that Reed had numerous zip ties that were a microanalytical match for the ones used to bind the victim's wrists. Given this proof, a rational jury could have found beyond a reasonable doubt that Reed was the perpetrator of the offenses in this case. Accordingly, we conclude that the evidence is more than sufficient to sustain Reed's convictions.

IV. **New Jury Empaneled.** Reed also argues that his guilty pleas should have been immediately assessed and a new jury empaneled, upon acceptance or rejection of the pleas, in order to ensure that he had a fair and unbiased trial. See Jones v. State, 403 S.W.2d 750, 753 (Tenn. 1966). He asserts that although he attempted to plead "guilty to theft of property on the basis of receiving the property and withdrawing the amounts from the [debit] card," the State stopped his plea to this count and called into question the factual basis of the plea, which caused the trial court to reject his guilty plea two days after it was made in front of the jury. Reed claims that the State then proceeded at trial on a different theory for the theft charge than the one announced during the guilty plea colloquy and later "used" his guilty plea to this charge during its rebuttal closing

argument, which resulted in the jury's convicting him of first degree premeditated murder, first degree felony murder, and aggravated robbery. Reed insists that because "no amount of limiting instructions would have 'put the genie back in the bottle[,]' . . . a repaneling [sic] of the jury was necessary to a fair and unbiased trial thereafter." The State responds that because Reed never requested a mistrial after the trial court rejected his guilty plea to theft of property, this issue is waived, and that waiver notwithstanding, Reed has not shown the trial court's failure to declare a mistrial under these circumstances was plain error. We conclude that Reed has waived this issue and is not entitled to plain error relief.

The record reflects that Reed raised this issue for the first time in his motion for new trial. Accordingly, we agree with the State and conclude that Reed has waived plenary review of this issue by failing to "take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). Significantly, when the trial court rejected his guilty plea to the theft of property charge, Reed never contemporaneously objected and never requested a mistrial. See State v. Robinson, 971 S.W.2d 30, 42-43 (Tenn. Crim. App. 1997) ("[F]ailure to make a contemporaneous objection or motion for mistrial constitutes a waiver of the issue absent the existence of plain error."). Accordingly, Reed has waived plenary review of this claim, and we may only review this issue for plain error. However, Reed has failed to request plain error relief as to this issue and, consequently, has failed to provide any analysis of the five factors required for plain error review.

In order for this court to find plain error,

"(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[P]lain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (citations and internal quotations marks omitted). It is the defendant's burden to persuade an appellate court that the trial court committed plain error. State v. Hatcher, 310 S.W.3d 788, 808 (Tenn. 2010). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors

cannot be established." Smith, 24 S.W.3d at 283. A recognition of plain error "should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Adkisson, 899 S.W.2d at 642.

Given the particular circumstances in this case, Reed has failed to establish that a clear and unequivocal rule of law was breached or that a substantial right of the defendant was adversely affected. The record shows that Reed failed to notify the trial court or the State of his intent to enter guilty pleas in front of the jury to the four charges for fraudulent use of a debit card and one charge for theft of property. See Tenn. R. Crim. P. 11(c)(2)(B) (stating that "[e]xcept for good cause shown, the parties shall notify the court of a plea agreement at the arraignment or at such other time before trial as the court orders") (emphases added); State v. Hawkins, 519 S.W.3d 1, 40 (Tenn. 2017) (concluding that the trial court did not abuse its discretion in refusing to accept the defendant's guilty pleas when the defendant admitted guilt to the relevant offenses three years prior and waited until after a jury was sworn, jeopardy had attached, witnesses were summoned, and the trial was underway before asking the trial court to accept his guilty pleas); State v. Todd, 654 S.W.2d 379, 382 (Tenn. 1983) ("The trial judge may accept or reject the plea agreement in the exercise of his discretion."). Once the trial court realized that Reed was pleading guilty to these offenses in the presence of the jury, it immediately announced that it would not accept the guilty pleas. A short time later, the trial court provided a curative instruction to the jury, stating that while it had accepted Reed's pleas of not guilty in case number 281407, it had not accepted Reed's "pleas with respect to the remaining count[s] in both indictments." The court then instructed the jury that "[Reed] starts this trial with a clean slate, with no evidence at all against him, and the law presumes that he is innocent." The court added that "[t]he presumption of innocence stays with [Reed] throughout the trial[,] and it is not overcome unless and until the State presents evidence here in court that overcomes that presumption and convinces you beyond a reasonable doubt that he is guilty." The trial court, upon being surprised with Reed's guilty pleas, provided a detailed curative instruction to the jury about Reed's presumption of innocence and the fact that the prosecution had the burden of proving guilt beyond reasonable doubt, and we must presume that the jury followed this instruction. See State v. Reid, 164 S.W.3d 286, 323 (Tenn. 2005); State v. Shaw, 37 S.W.3d 900, 904 (Tenn. 2001).

It is also clear that Reed waived this issue for tactical reasons. Based on the defense's opening and closing statements, as well as its proof, the defense theory at trial was that while Reed was guilty of fraudulent use of a debit card and theft of property, he was not guilty of murdering or robbing the victim. Therefore, Reed's attempt to plead guilty to these offenses in front of the jury at the beginning of his trial was made for the tactical purpose of cementing this defense theory in the minds of the jurors.

Finally, Reed has failed to establish that consideration of the error is "necessary to do substantial justice." Reed failed to notify the trial court or the State of his intent to enter a guilty plea in front of the jury to the four charges for fraudulent use of a debit card and one charge for theft of property, a decision of which defense counsel were well aware. Because Reed created the issue of which he now complains, this circumstance heavily weighs against a finding that consideration of the error is "necessary to do substantial justice." Moreover, we recognize that there was overwhelming evidence of Reed's guilt presented at trial. The proof showed that a DNA profile consistent with the victim's DNA was found on Reed's shirt, that Reed could not be excluded as a contributor of the DNA on the cellophane or zip ties found at the crime scene, that Reed possessed and used the victim's debit card the day she was murdered, and that Reed had numerous zip ties that were a microanalytical match for the ones used to bind the victim's wrists. Because Reed has failed to establish that a clear and unequivocal rule of law was breached, that a substantial right of the defendant was adversely affected, that he did not waive the issue for tactical reasons, or that consideration of the error is "necessary to do substantial justice," we conclude that he is not entitled to plain error relief on this claim.

**V. Admission of Photographs of the Victim.** Lastly, Reed argues that the trial court erred in admitting, over his objection, life and death photographs of the victim at trial. The State responds that the life and death photographs were properly admitted. We agree with the State.

At the June 22, 2018 hearing, the State notified the trial court that it intended to introduce a life photograph of the victim pursuant to Code section 40-38-103(c) to show the victim's general appearance and condition while alive pursuant to the statute. When the trial court questioned how the victim's appearance would be relevant to the issues at trial, the State replied, "I want [the life photograph] in because I want the jury to see the victim. I'll just be blatant with the Court. I think that there could be some arguments." The trial court then stated:

> The reason the issue is concerning a little bit [is] because I have what appears to be from [State v.] Adams[, 405 S.W.3d 641 (Tenn. 2013),] clear [Tennessee] Supreme Court authority saying trial courts really need to watch this. And if the real reason [the State is offering the life photograph] is to show how the victim looked, despite what I would believe to the contrary, it's not relevant. And then I have the General Assembly saying it absolutely is relevant. And so I've got a conflict between the two branches of government about what this court [should do].

- 30 -

After engaging in a discussion regarding how <u>State v. Mallard</u>, 40 S.W.3d 473 (Tenn. 2001), would apply to this issue, the trial court told the State, "If you would like to take this issue back up on the morning of trial and submit to the Court the State's reason and response on how the statute would not violate the separation of powers, I would love to consider it." The State explained that its intent in addressing the life photograph at that point was to disclose it pursuant to discovery, and the trial court said, "Let's hold that issue [regarding the potential separation of powers problem] in abeyance. . . . There may not even be an objection to it on the basis of relevance. If not, then we don't reach the constitutional issues."

On July 17, 2018, at a jury-out hearing immediately prior to the start of trial, the State asserted that it would not be proceeding under the Code section 40-38-103(c) but did want to admit the life photograph of the victim to prove that this was "an intentional killing" and that Reed acted with "premeditation. The State said its theory was that "the deadly weapon used in this case was the cellophane that was wrapped around [the victim's] face causing her suffocation." It asserted that "the tightness of that [cellophane] wrap and the impact that it had on her nose, her inability to breathe, is absolutely up for dispute in this case[.]"

The State also asserted that it was seeking to admit two photographs of the victim taken at the medical examiner's office to show the marks on the victim that were caused "during the course of her death," either "[d]uring her struggle to survive or during the struggle that ensued when she was being . . . murdered." The State said that although it knew that the court had to look very closely at autopsy photographs to ensure that they did not prejudice the jury, it had "been very judicious in choosing those [two] photographs."

The defense immediately objected to the life photograph of the victim on the grounds that the photograph was irrelevant and "highly prejudicial." When the trial court asked defense counsel how the life photograph was prejudicial, the following discussion occurred:

Defense Counsel:    [T]he idea that the only way we're going to be able to prove premeditation is to show how [the victim's] nose is oddly shaped after having her head wrapped in cellophane is a stretch, to say the least, Judge. I mean anyone who looks at a person with cellophane wrapped around their head knows that they died of asphyxiation. There is simply no reason to show a photograph that is purely about being held up at closing arguments saying this sweet [victim], or

whatever it is, Judge. You see? So my argument is it's, you know, way prejudicial.

Trial Court: Okay.

The State: Judge, the State's theory is not that she died of asphyxiation. I think if that's all that the State had to prove, this trial would be very different. The State has to prove intent and premeditation, so it's much more than just how this victim died.

Trial Court: Okay. I think as an objection under 401 and 403 as offered by the State, the <u>Mallard</u> issues that concerned the Court previously no longer exist, and so the Court now is looking to what the probative value of the life photograph would be and then balance that with the corresponding dangers of, as articulated here, unfair prejudice.

In this case, the life photograph[], the Court finds, [is] probative insofar as premeditation is an issue. For example, there's no strict standard that governs what constitutes proof of premeditation, though the circumstances in the case could allow a jury to infer premeditation from a variety of factors.

One that the court of criminal appeals has recognized is the particular cruelty of the killing. . . .The tightness with which the cellophane had been wrapped around the face could support a finding of premeditation, the nature of the killing also . . . . So the Court finds there is probative value and relevance to the photograph.

With respect to . . . whether the life photograph itself is prejudicial, the Court doesn't see anything about the life photograph[] [itself] that would be inherently prejudicial . . . , at least under those theories, and so the Court would admit the life photograph[] under the balancing test in 403.

With respect to the autopsy photos, [defense counsel], . . . to address your objection specifically with respect to the [autopsy] photograph that I'm holding here with [the victim] with the cellophane, your arguments are well taken. The Court believes that those arguments go to the weight of the evidence, maybe not necessarily to the admissibility of the evidence, and certainly the Court would expect you to make those arguments to the jury.

[Defense counsel], do you have any further objections to the autopsy photos?

Defense Counsel: No, Your Honor. That's what [we] discussed.

Trial Court: Okay. With respect to the autopsy photos themselves, the Court also finds that those photographs have probative value. Insofar as premeditation is concerned, the [probative] value of the photographs as evidence is important in terms of their clarity, in terms of perhaps of their accuracy.

There may be—as the testimony develops with the medical examiner, there may be other issues the Court could take up later, but at least as of right now the Court does not believe that the two [autopsy] photographs are so graphic or gruesome such that the danger of unfair prejudice here would outweigh the probative value. The Court does not find that the primary purpose of the photographs, at least now before the evidence is taken, would be designed to elicit emotions of bias, sympathy, hatred, contempt, retribution or horror.

So I think right now, General, with respect to these photographs, . . . the Court does not make a finding that . . . the nature of the photographs themselves are so gruesome that it would prohibit their introduction.

At trial, the State admitted the life photograph of the victim during Cynthia Price's testimony. The State asked Price if the photograph accurately reflected the victim's physical appearance prior to her murder, and Price responded affirmatively. Before this photograph was admitted, the defense asserted that it had no objections to this photograph other than the objections on which the trial court had already ruled.

The State admitted one death photograph of the victim during Patricia Steinway's testimony. This photograph depicted the victim on the floor of her bedroom with cellophane wrapped around her head and with her hands bound behind her back. Steinway acknowledged that this photograph of the victim fairly and accurately depicted what she saw when she found the deceased victim on June 15, 2011. She stated that she was unable to see the victim's face because it was "wrapped in plastic[,]" and the victim "wasn't moving."

During Officer Johnson's testimony, the State admitted several photographs of the crime scene, including seven photographs that depicted the deceased victim. The defense, out of the hearing of the jury, objected that the number of photographs was "prejudicial." The trial court, overruling the defense's objection, noted that the photographs "portrayed different perspectives of the victim" and that "none of the photographs [were] duplicative in their nature." The trial court also held that "outside of the nature of the act itself[,]" the photographs were "not particularly gruesome." At that point, the defense asserted that "if there is no reason to have different perspectives, . . . then it's just duplicative and [the photographs are being presented] for the [purpose] of prejudicing the jury." The trial court stated that "the different perspectives [were] necessary for the jury to have a sense of the surroundings," which made the photographs "probative." The court also held that because it did not "think the danger of unfair prejudice would outweigh [the photographs probative value]," the photographs were admissible.

During Dr. Metcalf's testimony, the State admitted two photographs, Exhibits 105 and 106, that were taken at the time of the victim's autopsy. Exhibit 105 showed bruising on the victim's right arm, and Exhibit 106 showed how the victim's nose had been flattened from the cellophane that had been so tightly wrapped around her face.

At the motion for new trial hearing, appellate counsel argued that "it [wa]s clear from the autopsy report alone that there had been premeditation" and "[t]he fact there there were [life and death photographs of the victim] that were admitted despite the existence of this autopsy report and other pieces of evidence which could have been used to prove [premeditation], severely lowers the probative value of the photographs [admitted]." The trial court responded that although it believed initially that the State was offering the life photograph of the victim to show a life in being, implicating

Mallard, by the first day of trial it became clear that the State was actually offering the life photograph "by way of comparison to the autopsy photographs [to show] how tightly the cellophane was wrapped." The court added that "the cellophane had been wrapped so tightly around [the victim's] head that her nose was flattened essentially, [which] was probative of premeditation." Appellate counsel insisted that the autopsy report "diminished the probative value of the photographs" and then asserted that the death photographs were "gruesome." Citing State v. Davidson, 509 S.W.3d 156, 199-201 (Tenn. 2016), the trial court countered that "if the photograph is gruesome . . . only because the nature of [the] killing itself is gruesome[,] then prejudice is less likely to exist there because the State has the right to prove the nature of the crime." Appellate counsel replied that he believed "the jury did not have to see these photographs in order for the State to possibly prove its case" and argued that these photographs admitted for "purely . . . or almost purely, emotional rhetoric as opposed to any kind of substantive value[.]"

At that point, the trial court stated:

All right, the Court will very respectfully deny the motion for new trial on this ground for the reasons stated at trial. But the Court would reiterate, even under the State [v.] Banks[, 564 S.W.2d 947, 951 (Tenn. 1978),] test . . . the Court believed then, as it does now, that [the] autopsy photographs . . . had probative value in the case.

The photographs, particularly in comparison with the life photograph, were clearly relevant and had significant probative value to show the nature and extent of the victim's injuries, and w[ere] probative particularly to premeditation.

The Court of Criminal Appeals has recognized that . . . autopsy photographs [that are] probative of premeditation may be admitted. That's State [v. David G.] Jenkins[, No. M2016-00270-CCA-R3-CD, 2017 WL 1425610 (Tenn. Crim. App.] April 21, 2017[)]. As well as [Edgar Ray] Bettis [v.] State, [No. M2017-01845-CCA-R3-PC, 2018 WL 3342830 (Tenn. Crim. App.] July 9, 2018[)]. I think Bettis may have also quoted Davidson . . . , noting that post-mortem pictures can also be relevant to the issue of deliberation or premeditation.

. . . [H]ere, the probative value must be substantially outweighed by the danger of unfair prejudice. And as our courts have noted, State [v.] James[, 81 S.W.3d 751 (Tenn.] 2002[)], . . . Rule 403 is a rule of admissibility and it places a heavy burden on the parties seeking to exclude the evidence.

- 35 -

. . . [I]n State [v.] Zeigler, [No. M2017-01091-CCA-R3-CD, 2019 WL 484647 (Tenn. Crim. App. Feb. 7, 2019), the Court of Criminal Appeals] went further to note that excluding relevant evidence under Rule 403 is an extraordinary remedy that should be used sparingly. And persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion.

And in this case, the Court does not believe that the prejudice, if there is any, outweighs the probative value of the photographs. Once again, to the extent that the autopsy photographs [c]ould be fairly characterized as gruesome, and the Court doesn't believe that they were, but to the extent that they were, it's by virtue of the nature of the crime itself. State [v.] Davidson recognized that principle as well as State [v. Lesergio Duran] Wilson[, No. M2017-01950-CCA-R3-CD, 2019 WL 246249 (Tenn. Crim. App. Jan. 17, 2019)].

And to the extent that the evidence was cumulative, the Court doesn't believe that it was. But to the extent that it was cumulative, relevant photographs are not rendered inadmissible merely because they are cumulative. State [v.] Willis, [496 S.W.3d 653 (Tenn. 2016)], among other authorities for that proposition.

**A. Constitutionality of Code Section 40-38-103(c).** Reed contends that the Tennessee Code Annotated section 40-38-103(c), which states that appropriate life photographs of homicide victims are admissible evidence, violates the separation of powers clause by taking all discretion regarding the admissibility of such photographs away from the trial courts. The State responds that because Reed failed to challenge the admission of the life photograph on constitutional grounds at trial, he has waived this issue and is limited to plain error relief. Waiver notwithstanding, the State also asserts that Code section 40-38-103(c) is constitutional because it preserves the trial court's discretion regarding the admissibility of such photographs. We agree with the State that Reed has waived this issue and is not entitled to plain error relief.

In Adams, 405 S.W.3d at 657, the Tennessee Supreme Court noted that it had "consistently cautioned the State against the introduction of such [portrait-style] photographs as evidence because they typically lack relevance to the issues on trial and because of their potential to unnecessarily arouse the sympathy of the jury." Nevertheless, the court recognized that "[g]enerally, photographs taken during the life of

- 36 -

a victim are not so prejudicial as to warrant a new trial." Id. at 658. In 2015, the legislature amended Code section 40-38-103(c) to state, "In a prosecution for any criminal homicide, an appropriate photograph of the victim while alive shall be admissible evidence when offered by the district attorney general to show the general appearance and condition of the victim while alive."

After carefully reviewing the record, we conclude that Reed never argued Code section 40-38-103(c) violated the separation of powers clause prior to this appeal. Accordingly, we agree with the State that Reed has waived plenary review of this issue and is limited to plain error review. See Tenn. R. App. P. 36(a). We note that Reed has again failed to provide any analysis of the five factors required for plain error review.

A review of Code section 40-38-103(c) requires both constitutional and statutory interpretation, which are reviewed de novo, affording no presumption of correctness to the trial court's conclusions. State v. Burgins, 464 S.W.3d 298, 305 (Tenn. 2015). When interpreting statutes, this court must begin with the presumption that legislative acts are constitutional. Id. (citing Riggs v. Burson, 941 S.W.2d 44, 51 (Tenn. 1997)). "'[W]e must indulge every presumption and resolve every doubt in favor of constitutionality.'" Lynch v. City of Jellico, 205 S.W.3d 384, 390 (Tenn. 2006) (quoting Vogel v. Wells Fargo Guard Servs., 937 S.W.2d 856, 858 (Tenn. 1996)). Accordingly, this court must "adopt a construction which will sustain a statute and avoid constitutional conflict if any reasonable construction exists that satisfies the requirements of the Constitution." Davis-Kidd Booksellers, Inc. v. McWherter, 866 S.W.2d 520, 529 (Tenn. 1993).

The Tennessee Constitution provides, "No person or persons belonging to one of [the three distinct departments of government] shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted." Tenn. Const. art. II, § 2. We recognize that "[o]nly the Supreme Court has the inherent power to promulgate rules governing the practice and procedure of the courts of this state, and this inherent power 'exists by virtue of the [Constitution's] establishment of a Court and not by largess of the legislature.'" State v. McCoy, 459 S.W.3d 1, 9 (Tenn. 2014) (quoting Mallard, 40 S.W.3d at 480-81 (alterations in original)). "A legislative enactment which does not frustrate or interfere with the adjudicative function of the courts does not constitute an impermissible encroachment upon the judicial branch of government." Underwood v. State, 529 S.W.2d 45, 47 (Tenn. 1975). "[T]his Court will consent to rules of procedure or evidence that are promulgated by the legislature so long as they '(1) are reasonable and workable within the framework already adopted by the judiciary, and (2) work to supplement the rules already promulgated by the Supreme Court.'" McCoy, 459 S.W.3d at 9 (quoting Mallard, 40 S.W.3d at 481).

While Code section 40-38-103(c) requires admission of "an appropriate photograph of the victim while alive," the admission of such photograph will only occur in certain cases. State v. Glen Allen Donaldson, No. E2019-00543-CCA-R3-CD, 2020 WL 2494478, at *10 (Tenn. Crim. App. May 14, 2020) (citing Tenn. Code Ann. § 40-38-103(c)), perm. app. filed (July 9, 2020). The plain language of this statute clearly states that the trial court still has the discretion to decide whether a life photograph of a homicide victim is appropriate for admission. See id. (citing Tenn. Code Ann. § 40-38-103(c)). Pursuant to Code section 40-38-103(c), a trial court may exclude such a photograph, even if relevant to show the "general appearance and condition of the victim while alive," see Tenn. Code Ann. § 40-38-103(c), if the court determines that the photograph's "probative value is substantially outweighed by the danger of unfair prejudice" under Tennessee Rule of Evidence 403. Glen Allen Donaldson, 2020 WL 2494478, at *10. In such a scenario, the photograph would be inappropriate and, therefore, excludable under Code section 40-38-103(c). Id.

Here, the life photograph depicts the victim seated at a table and smiling, with her profile in sharp relief. As the trial court recognized, this life photograph showed the appearance of the victim's nose prior to her death, and when compared to the death photographs, helped the State establish that the cellophane had been wrapped so tightly around the victim's head that it flattened her nose. As we will explain below, this photograph was probative of intent and premeditation and did not cause unfair prejudice to Reed requiring its exclusion. Because Reed has failed to establish that a clear and unequivocal rule of law was breached, that a substantial right of the defendant was adversely affected, or that consideration of the error is "necessary to do substantial justice," we conclude that he is not entitled to plain error relief on his claim that Code section 40-38-103(c) is unconstitutional.

B. **Admissibility of Life and Death Photographs.** Alternatively, Reed argues that admission of the life photograph violated Tennessee Rule of Evidence 401 because it was irrelevant and violated Tennessee Rule of Evidence 403 because it was admitted solely for the purpose of prejudicing the jury against him. He claims that there were no issues regarding the victim's identity at trial and the life photograph had no probative value outside of showing the jury "what the victim looked like beforehand."

In addition, Reed argues that the death photographs of the victim violated Rule 403. He asserts that because the autopsy report and the manner of death left no question about the victim's identity or about the fact that the victim's death was a premeditated and intentional killing, the admission of the death photographs served to prejudice the jury. Reed asserts that the trial court should never have admitted the approximately sixteen death photographs of the victim, which he claims were "far more than were ever

- 38 -

needed to prove premeditation or intent," when these issues could have been proven through the autopsy report alone.

The State responds that the trial court appropriately exercised its discretion in admitting the life photograph. It also asserts the trial court properly admitted the death photographs of the victim because they were probative of intent and premeditation and were not particularly gruesome in nature. We conclude that the trial court did not abuse its discretion in admitting the life and death photographs of the victim.

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Lewis, 235 S.W.3d at 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)). "[T]he modern trend is to vest more discretion in the trial judge's rulings on admissibility." State v. Carruthers, 35 S.W.3d 516, 577 (Tenn. 2000).

To be admissible, all evidence, including photographs, must be relevant to an issue the jury must decide. Thomas, 158 S.W.3d at 394. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Advisory Comm. Notes).

When determining the admissibility of relevant photographic evidence, the trial court should consider the following factors:

> [the photographs'] accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

- 39 -

Id.

"[P]hotographs of [a victim's body] are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." Id. at 950-51. However, if the photographs "are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." Id. at 951. In addition, if photographs do not add anything to the testimonial descriptions, they may be excluded. Id. Moreover, if the defense offers to stipulate to the facts shown in a photograph or never disputes the testimony that the photograph illustrates, then admission of the photograph itself may not be justified. Id. However, "'photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used.'" Willis, 496 S.W.3d at 728 (quoting State v. Derek Williamson, No. M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011)); see State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993) (holding that despite the admission of a color videotape showing the victim's bodies, the color photographs of the deceased victims were not "unnecessarily cumulative"); State v. Brown, 836 S.W.2d 530, 551 (Tenn. 1992) (holding that the nine photographs of the victim's body were admissible, despite testimony graphically describing the victim's injuries, because the photographs established "the brutality of the attack and the extent of the force used against the victim"). If the State is required to establish the degree of a homicide, it may properly introduce photographs and other evidence bearing on that issue. Banks, 564 S.W.2d at 952; State v. McAfee, 784 S.W.2d 930, 933 (Tenn. Crim. App. 1989).

After examining the life photograph of the victim, we conclude that it is relevant, probative, and not unfairly prejudicial. Because the life photograph depicts the appearance of the victim's nose prior to her death, when it is compared to the death photographs of the victim depicting her flattened nose from the force with which the cellophane was wrapped, it supports the State's argument that the killing was done with intent and premeditation. The life photograph shows the victim sitting at a table smiling, and we agree with the State that this photograph does not cause unfair prejudice requiring its exclusion under Rule 403. There is no indication that the "primary purpose" of the life photograph was "to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" See State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting M. Graham, Handbook of Federal Evidence 182-83 (2d ed. 1986)). Because the probative value of the life photograph was not substantially outweighed by the danger of unfair prejudice, we conclude that the trial court did not abuse its discretion in admitting it.

We likewise conclude that the trial court did not err in admitting the two autopsy photographs of the victim because they were relevant, probative of intent and

premeditation, and not unfairly prejudicial. Although Reed argues that there were sixteen "death pictures" introduced at the same time as the autopsy report, only Exhibit 105 and 106 were actually admitted with the autopsy report. Exhibit 105 depicts a bruise on the back of the victim's left arm, and Exhibit 106 shows the disfigurement of the victim's nose after the cellophane wrap was removed. Because Reed was charged with first degree premeditated murder, the State was required to prove that he intentionally killed the victim and that he acted with premeditation, and the challenged photographs, which depict the manner in which the killing was carried out and the extent of the victim's injuries, were particularly probative of these issues. Moreover, these photographs are not particularly gruesome and are limited to the specific injuries suffered by the victim, which reduces the risk of undue prejudice. Accordingly, because the probative value of these photographs is not substantially outweighed by the danger of unfair prejudice, the trial court did not abuse its discretion in admitting them.

While there were eight other photographs of the deceased victim that were admitted at trial, these photographs were taken at the crime scene. Exhibit 10 depicted what Patricia Steinway saw when she first found the deceased victim on June 15, 2011. Exhibits 12 and 13 show different perspectives of the victim's bedroom, the contents of her purse scattered on the bed, and only a very small part of the victim's body. Exhibit 14 depicts the victim's clothed body with cellophane wrapped around her head and her arms behind her, Exhibit 15 depicts a close-up of the victim from her waist to her head, Exhibit 16 shows a close-up of the front of the victim's head with cellophane wrapped around it, Exhibit 17 depicts a close-up of the back of the victim's head with cellophane wrapped around it, and Exhibit 18 shows a close-up of the victim's hands bound behind her back. There is nothing unnecessarily gruesome about these photographs given the facts of this case. To the extent that Reed is challenging the admission of these photographs, we conclude that they, too, are relevant and are probative of intent and premeditation because they show the victim's hands bound behind her back and her head wrapped in Press-and-Seal cellophane, which caused her death. We also conclude that these crime scene photographs were not cumulative to each other or to the other evidence presented at trial, including the autopsy report, because they depicted the deceased victim from different perspectives, which assisted the jury in fully understanding the nature of the offenses and the manner in which the victim died. Because the probative nature of these crime scene photographs is not substantially outweighed by the danger of unfair prejudice, we also conclude that the trial court did not abuse its discretion in admitting them.

As a final note, we detect some clerical errors in the judgment forms that require correction. Here, the trial court merged Count 2 with Count 1. A complete judgment form for each count of the indictment is required by law. See State v. Berry, 503 S.W.3d 360, 364 (Tenn. 2015) (order for publication summarily granting the application of the

defendant under Rule 11 of the Tennessee Rules of Appellate Procedure and reversing a portion of the judgment of the Tennessee Court of Criminal Appeals) ("[W]hen two jury verdicts are merged into a single conviction, the trial court should complete a uniform judgment document for each count."). This rule ensures that there is a complete record of each conviction and sentence in the event that one of the convictions is later reversed. Therefore, we remand this case to the trial court for entry of corrected judgment forms for Count 1 and Count 2. On remand, the trial court should impose separate sentences for Count 1 and Count 2 and should place these sentences on each judgment form. Id. Next, the trial court should note in the "Special Conditions" box on Count 1, which is the greater or surviving conviction, that the conviction in Count 2 merges with the conviction in Count 1. This merger should also be noted in the "Special Conditions" box for Count 2. Id.

## CONCLUSION

We remand Reed's case for entry of corrected judgment forms in Counts 1 and 2 as specified in this opinion, but in all other respects, the judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE